*27 OPINION.
TuRnee:
The respondent has included in the taxable income of the three petitioners, Priddy, Lipstate, and Crews, as additional compensation for services rendered to the Sabine Eoyalty Corporation, certain amounts representing the fair market value of the shares of stock delivered to them during the year 1935. He relies on Indianapolis Glove Co. v. United States, 96 Fed. (2d) 816, and several other cases cited and discussed by the court in that decision.
The petitioners contend that they acquired the shares of stock by purchase, rather than as compensation for services rendered, and that no taxable gain in any amount was realized upon the receipt thereof. On brief they cite Omaha National Bank v. Commissioner, 75 Fed. (2d) 434; Gordon M. Evans, 38 B. T. A. 1406; and Electric Storage Battery Co., 39 B. T. A. 121, but they do not seem to rely on any particular case.
*28 The argument presented by the parties seems to be predicated on the assumption that the transaction between Priddy and the corporation, in so far as the tax question is concerned, should be treated the same as the transactions between the corporation and Lipstate and Crews. We think the assumption is correct, because they all received the stock in the same manner and under the same corporate resolutions.
In the resolution of October 8, 1981, the only reason indicated or explanation given for the understanding that the corporation would hold in its treasury 10 percent of the first authorized stock for petitioner Priddy was that he was “taking the leading part in organizing this company.” The resolution does not contain anything indicating that the corporation agreed to sell or that he agreed to purchase the stock in question, nor does it indicate that they contemplated such a transaction. It is true that at the same time another resolution was adopted which gave the original subscribers the opportunity, after one-half of the stock of the corporation had been sold, to subscribe pro rata for the remaining one-half of the stock at the original price of $4 per share before it was offered to others, but the stock in question was not acquired under this latter resolution.
The stock was in fact delivered to the three petitioners under and pursuant to the resolution adopted by the Texas corporation on November 10, 1933, and the provisions contained therein leave no doubt as to the nature of the transaction. That resolution recited that petitioner Priddy was “largely instrumental” in the organization of the corporation and' that it was understood that he would receive the stock in question “conditioned upon the performance of the work which he was to do.” Then the resolution provided that the stock would be “held in the treasury” and “remain the property of the corporation” until the time and upon the contingency mentioned and would be delivered to Priddy only upon full compliance with certain conditions, namely, that he “will continue the management of the affairs of the Sabine Eoyalty Corporation upon a nominal salary to be fixed from time to time, and if and when the common stock dividends paid to the original investors have equaled the sum of $4 per share.” Priddy had agreed with Lipstate and it was understood from the beginning by all the interested parties that the latter would be entitled to receive a portion thereof, or 1,000 shares, provided that he put forth his best efforts in promoting the affairs of the corporation, also that he would become its secretary and treasurer and would serve on the executive committee. It was likewise agreed and understood that Crews would be entitled to receive 300 shares, provided he served as president of the corporation and a member *29 of the executive committee and used his influence in promoting the affairs of the corporation. The three petitioners performed the duties required of them and in August 1935 the dividends paid on issued and outstanding stock aggregated more than $4 per share and the stock in question was delivered to them.
The transactions as finally consummated clearly lacked certain essential elements of sales. The corporation never agreed to sell the stock, the petitioners never agreed to purchase it, and they did not in fact purchase it. If they had not rendered the services required of them and if the dividends on outstanding stock never had aggregated as much as $4 per share, they might never have become the owners of the stock. Assuming that the petitioners could have purchased the stock in question at any time under the resolution above referred to by paying in the difference between the aggregate dividends paid per share) and $4, the fact still remains that they did not do so with respect to the stock in question. They gave nothing for the stock except their services, and we think they received it as compensation for such services. Indianapolis Glove Co. v. United States, supra.
The record shows that none of the stock in question was issued or outstanding and no dividends were paid thereon until it was delivered to petitioners in August 1935. They were not entitled to any part thereof until it was delivered to them, and it constituted income to them at that time to the extent of its fair market value. The respondent has determined that the fair market value of the stock was $7 per share and on that basis has computed the additional compensation received by each petitioner. They have not shown that this determination is erroneous, and it is accordingly sustained.
The next issue is whether the petitioner, Walter M. Priddy, sustained a deductible loss in 1935, either ordinary or capital, as a result of the foreclosure by the John. Hancock Life Insurance Co. of the second deed of trust on the Brooks Thompson farm.
Petitioner Priddy contends on brief that as a result of the foreclosure sale his interest in the property, which he claims .exceeded $55,000, became a total loss in 1935 and is deductible from gross income in its entirety as an ordinary loss, citing John O. Fowler, 40 B. T. A. 1293; and Commissioner v. Hammel, 108 Fed. (2d) 753; certiorari granted, 310 U. S. 619. His position seems to be that, although legal title had passed to others in 1927 or 1928, he still retained some interest or equity in the property until the date of the foreclosure sale and that the loss was not realized until that time.
The respondent contends that the petitioner lost his investment in the property prior to or during 1928 and that the loss is not deductible in 1935. He argues that the transaction whereby the petitioner conveyed the property to the committee of three or four individuals *30 selected bj the creditors, which conveyance was made in 1927 or 1928, must be considered a sale of the property as of the date of the conveyance, and when so considered it establishes the loss of his investment in the property, citing Rogers v. Commissioner, 103 Fed. (2d) 790; certiorari denied, 308 U. S. 580, or, if he retained any interest in the property subsequent to that conveyance, such interest was acquired by the receivers, as officers of the court, when the property was transferred to them, citing Atlantic Trust Co. v. Chapman, 208 U. S. 360, 370, 371, and that such interest was subsequently disposed of by sale to the creditors’ committee, citing Berry v. Harrell, 83 Fed. (2d) 671; certiorari denied, 299 U. S. 559. He also argues that the petitioner abandoned any interest he had in the property prior to 1935, citing Rhodes v. Commissioner, 100 Fed. (2d) 966; Realty Operators, Inc., 40 B. T. A. 1051; and W. W. Hoffman, 40 B. T. A. 459. He further contends that the cost of improvements on the farm could not be included in petitioners cost basis because he has not proven the depreciated cost of such improvements.
The petitioner’s contention that he retained an interest or equity in the property until the date of the foreclosure sale seems to rest on the fact that the debtors had an oral understanding with the creditors that if any residue remained after all the debts were paid, such residue would be distributable to them, and further that they had hopes of thereby salvaging something out of the properties conveyed.
The record shows that at the time the creditors’ committee took over the properties it was estimated that the combined claims of the various creditors were in excess of $6,000,000 and that the combined value of all the properties to be taken over was around $4,000,000. See Thomas v. Perkins, 108 Fed. (2d) 87. The record also shows that at that time the committee held unsecured and partially secured claims against the petitioner Priddy in the amount of $3,038,023.53, and he testified that the total value of his assets was around $2,000,000. It thus appears doubtful whether he had any well founded hopes of salvaging anything out of the properties conveyed. Moreover, the hope that some residue would remain after the debts had been paid and the oral understanding that such residue would be distributed to the debtors do not establish that the loss was sustained in 1935. The facts of record indicate that the loss was sustained in 1927 or 1928, and we think that is the only reasonable conclusion that can be reached. In any event we do not think the petitioner has overcome the prima facie correctness of the respondent’s determination, and it is accordingly sustained. In view of this conclusion, it is unnecessary to consider the question of whether a loss sustained as a result of a foreclosure sale constitutes an ordinary or capital loss, which question is pending before the Supreme Court.
*31 The next issue involves the question of whether the respondent erred in disallowing the deduction of a portion of the business expenses claimed by the petitioner Priddy to have been incurred and paid in 1935 and 1936.
On his return for 1935 Priddy deducted the amount of $2,304 as business expenses, $1,200 of which represented expenditures for meals, hotels, etc., while he was absent from Wichita Falls and included living expenses while in Tyler, and the remaining $1,104 represented automobile expenses computed at the rate of 5 cents per mile, which included mileage covered on week-end trips between Tyler and Wichita Falls. On his return for 1936 he deducted as business expenses an amount of $2,776 representing combined expenditures for automobile, meals, hotels, etc., which amount was arrived at by substantially the same method of computation as employed in arriving at the deduction for 1935. Of the deductions claimed the respondent disallowed $926.07 for 1935 and $1,116.06 for 1936.
The dispute centers around the location of Priddy’s “home” as that term is used in section 23 (a) of the Be venue Acts of 1934 and 1936. In Mort L. Bixler, 5 B. T. A. 1181, we said that a taxpayer’s “home”, as that term was used in the statute, was his “place of business, employment, or the post or station at which he is employed.” We held that a taxpayer may not keep his place of residence at a point where he is not engaged in carrying on a trade or business and take a deduction for his living expenses while away from such residence or deduct traveling expenses for trips between his place of business and such residence. That case has been consistently followed. Charles E. Duncan, 17 B. T. A. 1088; affd., 47 Fed. (2d) 1082; Jermie A. Peters, 19 B. T. A. 901; and George W. Lindsay, 34 B. T. A. 840.
The facts here show that Priddy’s “home”, as that term is used in the applicable revenue acts, was at Tyler, Texas, which was his principal place of business and the place where his employment by the Sabine Eoyalty Corporation necessitated the maintenance of regular living quarters. He was not away from his “home” in the pursuit of a trade or business while he was in Tyler and he is not entitled to deduct the cost of meals and lodging incurred and paid while he remained in that city. The same is true with respect to the expenses ascribed to the automobile trips made to Wichita Falls for the purpose of visiting his family over week ends.
While it is true that Priddy was also a salaried officer of the Ellis Drilling Co. and the Walter Priddy Corporation, which offices required hinT to make occasional trips to Duncan, Oklahoma, and Wichita Falls, he testified that those corporations usually paid his *32 traveling expenses. If there were any exceptions during the taxable years, they are not shown by the record.
Being of the opinion that Priddy was not entitled to deduct living expenses while in Tyler, nor the automobile expenses of the weekend trips to Wichita Palls, and considering the amount of time spent at Tyler and the number of such week-end trips, we think the respondent was reasonable in his disallowance of $926.07 of the business expenses claimed for 1935 and $1,116.06 for 1936. His action is accordingly sustained.
In the notice of deficiency the respondent determined that in 1935 the petitioner Lipstate received commissions in the amount of $2,082.20, that he reported only $1,315.20, and that the difference of $767 should be added to his income. Lipstate testified that the credits entered in his “commission account” included an opening entry of $867 under date of January 1, 1935, which had in fact been earned in 1934 and had been collected in cash during that year and reported in his 1934 income. *
: On brief the respondent seems to be willing to accept the explanation offered by Lipstate (at least he does not argue otherwise), but he is still unwilling to concede the issue. He now contends that during 1935 commissions of $3,175.40 were credited to the “commission account.” Then, for some reason, he deducts $59.17, which he says was the credit balance in Lipstate’s “employee account”, and arrives at the figure of $3,116.23, which he states was either paid or beneficially credited during that year. From this figure he deducts $2,182.20 ($1,315.20 reported in 1935 plus $867 allegedly received in 1934) . and arrives at the figure $934.03, which he now contends that Lipstate neither reported as income nor accounted for.
With respect to this new contention of the respondent it will suffice to point out that the $3,175.40 which he now contends was credited on the “commission account”, represents gross credits and does not take into consideration the adjusting debits entered thereoil.
We have carefully checked a photostatic copy of the commission account introduced as evidence and we have found that it shows net credits representing commissions earned in 1935 in the total sum of $1,637.20. On brief the petitioner contends that in computing the net credits entered on the account, two offsetting items in the respective amounts of $80 and $81, which had not been entered asi debits on the account, should be taken into consideration. The explanation entered on the account with respect to these two items is so confusing that we are unable to reach any such conclusion and in the absence of any other evidence on this point the contention is rejected. The account shows net credits in the amount of $1,637.20 and, since Lip- *33 state reported only $1,315.20, the difference should be added to his taxable income.
Several other issues were raised in the petitions of Walter M. Priddy and 0. 0. Crews, but they presented no evidence or argument with respect thereto and such issues will be regarded as having been abandoned by them.

Decisions will be entered under Rule 50.